**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JOSPEH JOHNSON,
          Plaintiff,

    v.

DISTRICT OF COLUMBIA, *et al.*,
          Defendants.

---

Civil Action No. 17-883 (CKK)

**MEMORANDUM OPINION**
(September 30, 2020)

On March 8, 2016, officers of the Washington, D.C., Metropolitan Police Department ("MPD") arrested Joseph Johnson ("Plaintiff") at Gallery Place, located on the 700-block of 7th Street, N.W., Washington, D.C.  MPD officers Amina Coffey, Anthony Willis, Jr., Cameron Reynolds, Owais Ahktar, and Sergeant Francis Martello were each present around the time of Plaintiff's arrest.  On the basis of this arrest and its attendant circumstances, Plaintiff has asserted constitutional and common law claims against the individual officers and also against the District of Columbia under the theory of *respondeat superior* (collectively with the individual officers, "Defendants").

Specifically, Plaintiff has raised four constitutional claims under 42 U.S.C. § 1983: Excessive Force (Count VI), False Arrest (Count VII), Fabrication of Evidence (Count VIII), and Retaliatory Arrest (Count IX).  Plaintiff also asserts five parallel claims at common law: Assault (Counts I and II), False Arrest (Count III and IV), and Malicious Prosecution (Count V).  Presently before the Court is Defendants' [41] Motion for Summary Judgment.  Upon consideration of the pleadings, the relevant legal authorities, and the record as a whole,[1] the Court **GRANTS**

---

[1] This Memorandum Opinion focuses on the following briefing and evidence submitted by the parties:
- Am. Compl., ECF No. 13;
- Defs.' Mot. for Summ. J., ECF No. 41 ("Defs.' Mot.");

Defendants' Motion as to Plaintiff's claims for False Arrest (Counts III, IV, and VII), Malicious Prosecution (Count V), Fabrication of Evidence (Count VIII), and Retaliatory Arrest (Count IX). The Court, however, **DENIES** Defendants' Motion as to Plaintiff's claims for Assault (Counts I and II) and Excessive Force (Count VI).

## I.    BACKGROUND

The Court will present the background of this case in two parts.  First, the Court will provide the undisputed factual background for Plaintiff's claims.  This presentation will include those facts that are undisputed or unrefuted by the parties, as well as those facts clearly established by the video evidence in the record.[2]  *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (directing courts to "view[ ] the facts in the light depicted by the videotape").   Then, having set forth the undisputed factual background, the Court will outline those central facts which remain in dispute at the summary judgment stage.

### A.  Background Supported By Undisputed Facts In The Record

On March 8, 2016, MPD Officer Anthony Willis observed a civilian named Patrick Horton Smith-Shearer "sucker punch" a pedestrian at Gallery Place, located at 707 7th Street, N.W., Washington, D.C.   *See* Defs.' Stmt. ¶ 2; Pl.'s Opp'n at 3.  During this unprovoked assault, Mr. Horton Smith-Shearer chased down a pedestrian from behind and directed a closed-fist punch to

---

- Defs.' Stmt. of Undisputed Material Facts ("Defs.' Stmt."), ECF No 41–1;
- Pl.'s Opp'n to Defs.' Mot., ECF No. 48;
- Defs.' Stmt. of Undisputed Material Facts with Pl.'s Final Objections and Counter Stmt. of Facts ("Pl.'s Objection"), ECF No 48–1;
- Pl.'s Am. Opp'n to Defs. Mot. ("Pl.'s Opp'n"), ECF No. 65; and,
- Defs.' Reply, ECF No. 68.

[2] The video evidence in the record includes overhead footage from fixed-position cameras and "real-time" cell phone videos from bystanders present at the scene of Plaintiff's arrest.  These videos have certain limitations, including inconsistent vantage points, sporadic camera angles, and poor resolution.  There are no body worn police camera videos available in the record.  Accordingly, the Court's factual assessment relies on the video evidence only to the extent a fact therein is clearly established by the footage available.

the back of the pedestrian's head.  *See* Defs.' Mot., Ex. O, at (0:00:00–22).  Before Mr. Horton

Smith-Shearer could land a second punch, however, Officer Willis intervened, tackling Mr. Horton

Smith-Shearer to the ground and placing him under arrest.  *See id.*; Defs.' Stmt. ¶ 2.  Officer Willis

then handcuffed Mr. Horton Smith-Shearer with the assistance of his colleague, Officer Amina

Coffey.  *See* Defs.' Mot., Ex. O, at (0:00:21–50); Defs.' Stmt. ¶ 2.  Mr. Horton Smith-Shearer's

assault and subsequent arrest took place during the afternoon, while a large crowd of at least twenty

bystanders was gathered outside in the Gallery Place common area, and while only two MPD

officers (Officers Willis and Coffey) appeared at the initial arrest scene.  *See* Defs.' Mot., Ex. O,

at (0:00:00–22); Defs.' Stmt. ¶ 2.  And just moments after the arrest of Mr. Horton Smith-Shearer,

additional pedestrians walked directly towards the area.  *See* Defs.' Mot., Ex. N, at (00:55–01:05).

Officers Awais Ahktar and Cameron Reynolds subsequently joined Officers Coffey and

Willis at Gallery Place after responding to a radio request for assistance.  *See* Defs.' Stmt. ¶ 1; Pl.'s

Objection ¶ 1.  By the time Officers Ahktar and Reynolds arrived, the crowd at Gallery Place had

grown to a considerable size, was audibly hostile, and was encircling the arrest scene of Mr. Horton

Smith-Shearer.  Defs.' Stmt. ¶¶ 3–5; *see also* Defs.' Mot., Ex. O, at (0:00:21–50).  Members of the

crowd were vocally upset by the manner in which Officer Willis had tackled Mr. Horton Smith-

Shearer and were directing clear criticism, including some vulgarities, towards the arresting

officers.  *See* Defs.' Mot., Ex. O, at (0:00:21–55).  While attempting to control this hostile crowd,

Officer Willis left Mr. Horton Smith-Shearer with Officer Coffey and proceeded to arrest another

bystander named Marquesse Favors.  *See* Defs.' Mot., Ex. M, at (16:24:00–10); *see also* Pl.'s

Opp'n at 4; Pl.'s Objection ¶ 2.  At the same time, Officers Reynolds and Ahktar were attempting

to separate the surrounding crowd from the arrest scene.  Defs.' Stmt. ¶¶ 3–7.  Officer Ahktar, for

example, was shouting "back up" to bystanders.  *See* Pl.'s Objection ¶ 7; Defs.' Mot., Ex. O, at

(0:01:05–25).

As Officers Reynolds and Ahktar were controlling the hostile crowd, Plaintiff walked towards the area where Officer Coffey was arresting Mr. Horton Smith-Shearer.  *See* Defs.' Mot., Ex. O, at (01:05–11); *id.*, Ex. N, at (00:57–01:01).   Plaintiff's brother, Sidney Johnson, was standing only feet away from the arrest scene at the time.  *See id.*, Ex. O, at (01:05–11); Pl.'s Opp'n at 4.  Once Plaintiff had joined his brother, however, the pair started to walk away from the officers.  *See* Defs.' Mot., Ex. M, at (16:23:55–24:03).   But only seconds thereafter, Plaintiff and his brother encountered Officer Ahktar.  *See id.*, Ex. O, at (01:18–21).  Plaintiff and his brother then confronted Officer Ahktar, positioning themselves inches away from Officer Ahktar's face.  *See id.*   In response, Officer Ahktar pushed Plaintiff and his brother away.  *See id.*, Ex. M, at (16:24:06–10); Pl.'s Objections ¶ 8.  At the same moment, the video evidence shows Officer Ahktar suddenly and involuntarily lurching backwards, though the cause of this lurch remains in dispute, as discussed below.  *See* Defs' Mot., Ex. M, at (16:24:05–10).

Officer Reynolds, who was standing next to Officer Ahktar, observed these events and stepped in between Officer Ahktar and Plaintiff.  *See id.*; Defs.' Stmt. ¶ 9.  The video evidence then shows Plaintiff moving towards Officer Reynolds in response.  Defs.' Mot., Ex. M, at (16:24:06–10).  Plaintiff testified that, at this point, he came within an inch of Officer Reynolds' face and said "fuck you."  *Id.*, Ex. C (Johnson Dep.), at 99:1–11.  Officer Reynolds then pulled Plaintiff toward him by his arm and brought him to the ground using a tactical take down maneuver.  *See id.*, Ex. M, at (16:24:06–12); Defs.' Stmt. ¶ 12; Pl.'s Objection ¶ 12.  Once Plaintiff was on the ground, Officer Reynolds deployed multiple hand strikes to Plaintiff's head, though Plaintiff's conduct during this altercation remains disputed.  *See* Defs.' Mot., Ex. M, at (16:24:18–22); Defs.' Stmt. ¶ 15.  Officer Reynolds delivered these strikes first while Plaintiff was on his back and then also

once Plaintiff was rolled onto his stomach.  *See* Defs.' Mot., Ex. O, at (01:30–55); *id.*, Ex. M, at (16:24:15–41).  During the course of these hand strikes, Plaintiff was beneath Officer Reynolds and his hands were not in handcuffs.  *See id.*, Ex. O, at (01:30–55); *id.*, Ex. M, at (16:24: 15–41).  In his deposition, Officer Reynolds explained that he preferred these head strikes because "people are more compliant when you punch them in the face."  *Id.*, Ex. B (Reynolds Dep.), at 108:8–16.

After Officer Reynolds deployed his hand strikes, he was able to place Plaintiff in handcuffs.  *See* Defs.' Stmt. ¶¶ 18–20.  An FBI Agent, named Sean MacDougall was proximate to Officer Reynolds at the time of Plaintiff's arrest.  *See id.* ¶ 18.  Then, after handcuffing Plaintiff, Officer Reynolds escorted Plaintiff to a nearby police vehicle and positioned him with his back and hands against the police car.  *See id.* ¶ 21; Defs.' Mot., Ex. N, at (03:25–50).  A disputed altercation—discussed below—ensued in the seconds thereafter, during which time Plaintiff said to Officer Reynolds: "fuck you" and "fuck all y'all."  Pl.'s Opp'n, Ex. 1 (Johnson Dep.), at 74:2–17.  In response, Officer Reynolds turned Plaintiff around to face the car and pressed Plaintiff's upper body against the hood of the police vehicle for several seconds.  *See* Defs.' Stmt. ¶ 23; Defs.' Mot., Ex. N, at (03:39–46).  Officer Reynolds then stepped away from Plaintiff and left him in the custody of additional officers who had arrived on the scene.  *See* Defs.' Mot., Ex. N, at (03:40–50).  It is undisputed that during this entire transaction Officers Coffey, Willis, and Sergeant Martello had no contact with Plaintiff at all.  *See* Defs.' Stmt. ¶¶ 24–26; Pl.'s Objections ¶¶ 24–26.

Later that day, Officer Ahktar completed a police report documenting the circumstances of Plaintiff's arrest.  *See* Am. Compl. ¶ 89; Pl.'s Opp'n, Ex. 2 (Ahktar Dep.), at 124–125.  This report noted, in part, that Plaintiff was arrested for a misdemeanor offense of an Assault On A Police Officer.  *See* Pl.'s Opp'n, Ex. 14 (Arrest Report), at 3.  Officer Ahktar submitted this arrest report

to the United States Attorney's Office on March 8, 2016, and later attended a "papering conference" with a federal prosecutor to discuss the facts surrounding Plaintiff's arrest.  *See id.*, Ex. 2 (Ahktar Dep.), at 125–127.  On March 9, 2016, the United States Attorney's Office filed a single charge against Plaintiff in the Superior Court of the District of Columbia for a misdemeanor violation of assaulting a police officer, in the case captioned *United States v. Johnson*, 2016-CMD-003474.  *See* Pl.'s Opp'n, Ex. 15 (Docket Sheet).  Plaintiff appeared at an initial hearing on March 9, 2016, and on April 13, 2016, the D.C. Superior Court set a non-jury trial for a later date.  *See id.* The government, however, dismissed the case on July 18, 2016, before trial.  *See id.*

### B.  Facts Remaining In Dispute

Within this background, several central facts remain in dispute.  First, the parties disagree about whether Plaintiff physically assaulted Officer Ahktar and Officer Reynolds before Plaintiff's arrest.  Specifically, Defendants allege that Plaintiff "pushed" Officer Ahktar backwards after coming within inches of Officer Ahktar's face.  *See* Defs.' Stmt. ¶ 8.  Defendants then allege that Plaintiff also "physically assaulted" Officer Reynolds moments later, just before Officer Reynolds pulled Plaintiff to the ground.  *See id.* ¶ 11.  Conversely, Plaintiff has testified that he never physically assaulted either Officer Ahktar or Officer Reynolds.  *See* Pl.'s Objection ¶ 11; Pl.'s Opp'n, Ex. 1 (Johnson Dep.), at 56:8–10.  Upon review, however, the video evidence in the record does not clearly capture the moments surrounding these alleged physical assaults and, therefore, does not permit the Court to reach any resolution of these disputed facts.  *See, e.g.*, Defs.' Mot., Ex. M, at (16:24:06–10); *id.*, Ex. O, at (01:18–23).

Next, the parties also dispute whether Plaintiff was subdued or was, instead, actively resisting Officer Reynolds, while Officer Reynolds was arresting him and before Officer Reynolds struck Plaintiff in the head.  Here, Defendants allege that Plaintiff was "kicking wildly," Defs.'

Mot., Ex. D (MacDougall Dep.), at 35:8 to 35:16, and that Plaintiff punched Officer Reynolds in the face while fending off arrest, *see* Defs.' Stmt. ¶¶ 13–14.  And, according to Officer Reynolds, it was Plaintiff's punch that precipitated Officer Reynolds' decision to strike Plaintiff in the head while he was on the ground.  *See* Defs.' Mot., Ex. B (Reynolds Dep.), at 107:15–17.  Defendants have also produced a contemporaneous witness statement from FBI Agent MacDougall, which notes that Plaintiff "swung at Officer Reynolds with his fists, hitting him in the forehead."  Defs.' Mot., Ex. G (MacDougall Witness Stmt.).  Plaintiff, however, disputes that he ever resisted Officer Reynolds' arrest.  *See* Pl.'s Objection ¶¶ 13–14; Pl.'s Opp'n, Ex. 1 (Johnson Dep.), at 57:2–12.  Instead, Plaintiff has testified that he never punched Officer Reynolds, and that his movements while on the ground were merely reflexive forms of self-defense in response to Officer Reynolds' strikes, not active resistance.  *See id.*, Ex. 1 (Johnson Dep.), at 56–57, 60.

Here again, the video evidence in the record is insufficiently clear to provide any resolution of these disputed facts.  *See* Defs.' Mot., Ex. O, at (01:30–55); *id.*, Ex. M, at (16:24:18–21).  Specifically, Defendants' Exhibit M loses view of Plaintiff and Officer Reynolds immediately after the take down occurred, *see id.*, Ex. M, at (16:24:05–12), and Defendants' Exhibit O does not clearly pick up the encounter until after the two are already on the ground, with Officer Reynolds kneeling over Plaintiff, *see id.*, Ex. O, at (01:30–40).  Consequently, the Court is unable to discern from the video footage what precisely occurred in the moments after Officer Reynolds performed the take down maneuver on Plaintiff, and whether Plaintiff's motions at that point were reflexive measures of self-defense or, instead, active resistance.

Lastly, the parties dispute what occurred immediately before Officer Reynolds pushed Plaintiff against the hood of the police car.  Defendants assert that Plaintiff spit in Officer Reynolds' face immediately before this use of force.  *See* Defs.' Stmt. ¶ 22.  Plaintiff, however, flatly denies

this assertion, *see* Pl.'s Objection ¶ 22, and instead has testified that he did not spit in Officer Reynolds' face, but rather swore at him, *see* Pl.'s Opp'n, Ex. 1 (Johnson Dep.), at 74:2–17.  The entire sequence of events surrounding Plaintiff's alleged spitting action is captured on video, but even a close review of the footage does not clearly demonstrate whether the spitting action did or did not occur.  *See* Defs.' Mot., Ex. N, at (03:39–46).  This fact too, then, remains in dispute.

## II.   LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  FED. R. CIV. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir.

2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."  FED. R. CIV. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with "all justifiable inferences drawn in his favor." *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

### B.  Qualified Immunity

Officers are entitled to qualified immunity "under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (quotations omitted).  "In other words, existing

law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (quotation

omitted). "This demanding standard protects 'all but the plainly incompetent or those who

knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "A

defendant must first raise the defense of qualified immunity when facing a § 1983 claim, but once

asserted, the burden of proof falls to the plaintiff to show that the official is not entitled to qualified

immunity." *Campbell v. District of Columbia*, 245 F. Supp. 3d 78, 85 (D.D.C. 2017) (quotation

omitted).

## III.    DISCUSSION

Plaintiff raises nine individual claims, collectively against Defendants.[3]  These claims arise

under both federal law and the common law.  Specifically, Plaintiff asserts four constitutional

claims under 42 U.S.C § 1983: Excessive Force (Count VI), False Arrest (Count VII), Fabrication

of Evidence (Count VIII), and Retaliatory Arrest (Count IX).  Plaintiff also asserts five parallel

claims at common law: Assault (Counts I and II), False Arrest (Count III and IV), and Malicious

Prosecution (Count V).  Because subject matter jurisdiction in this case derives from Plaintiff's

federal causes of action, *see* 28 U.S.C. § 1331, the Court will address those claims first.  The Court

will then turn to Plaintiff's common law claims.

### PLAINTIFF'S FEDERAL CLAIMS UNDER § 1983

### A.  False Arrest (Count VII)

Plaintiff first asserts a false arrest claim against Defendants as a constitutional tort under §

1983.  *See* Am. Compl. ¶¶ 82–86.  Such a constitutional claim for false arrest derives from the

Fourth Amendment and its prohibition of unreasonable searches and seizures.  *See Wesby*, 138 S.

Ct. at 584.  Consequently, the applicable analysis turns on the question of probable cause, as "the

---

[3] Plaintiff voluntarily dismissed his *Monell* claim for municipal liability against the District of Columbia, in Count X of the Amended Complaint.  *See* Not. of Dismissal, ECF No. 22.

focal point of the action is the question whether the arresting officer was justified in ordering the arrest of the plaintiff." *Scott v. District of Columbia*, 101 F.3d 748, 754 (D.C. Cir. 1996) (quotation omitted).  In his opposition, Plaintiff stipulates that Officer Reynolds was the MPD officer that effectuated his arrest "when he pulled him, and grabbed him and slammed him to the ground." Pl.'s Opp'n at 9.  Accordingly, the Court will specifically assess whether Officer Reynolds possessed probable cause for Plaintiff's arrest.

### 1.  Facts Leading To Plaintiff's Arrest

Officer Reynolds arrived at Gallery Place, with his partner Officer Ahktar, following a radio run asking for assistance at an active arrest scene.  *See* Defs.' Stmt. ¶ 1.  When Officer Reynolds arrived, Officers Coffey and Willis were detaining Mr. Horton Smith-Shearer, who had just assaulted a pedestrian.  *See* Defs.' Mot, Ex. O, at (00:10–30); Defs.' Stmt. ¶ 2.  Shortly thereafter, Officer Willis arrested another bystander named Marquesse Favors.  *See* Defs.' Mot., Ex. M, at (16:24:00–08).  While Officers Willis and Coffey restrained these respective arrestees, Officer Reynolds attempted to separate the remaining bystanders from the arrest scene.  *See* Defs. Stmt. ¶ 7; Defs.' Mot., Ex. B (Reynolds Dep.), at 61:5–12.  Clear video evidence from the record demonstrates that a large and frenzied crowd of at least twenty individuals encircled the officers at this time, with only four MPD officers directly involved in the ongoing arrests.  *See* Defs.' Mot, Ex. O, at (00:20–50); *id.*, Ex. N, at (01:30–02:00).  And despite directions from Officers Ahktar and Reynolds to "back up," *see* Pl.'s Objection ¶ 7, the video evidence shows pedestrians either remaining on the scene or actively moving towards the officers, *see* Defs.' Mot, Ex. O, at (00:58–01:20); *id.*, Ex. N, at (01:30–02:00).  Officer Reynolds testified that he felt that this crowded environment was "hostile."  *Id.*, Ex. B (Reynolds Dep.), at 85:4–16.

In the moments before his arrest, Plaintiff walked through this crowd and towards Officer

Coffey, as she was detaining Mr. Horton Smith-Shearer.  *See* Defs.' Mot., Ex. O, at (01:05–11).

Plaintiff was then positioned, with his brother Sidney Johnson, only a few feet behind Officer

Willis.  *See id.*, Ex. M, at (16:23:50–24:04).  Next, Plaintiff and his brother walked past Officer

Willis as he was placing Mr. Favors under arrest, ostensibly leaving the arrest scene, but also

walking towards Officer Ahktar and Officer Reynolds.  *See id.*  At this time, Officer Ahktar was

shouting at the bystanders surrounding the arrest scene to "back up!"  *See id.*, Ex. O, at (01:11–

15); Pl.'s Objection ¶ 7.

In his deposition, Plaintiff admitted to hearing Officer Ahktar's "back up" commands.  *See*

Defs.' Mot., Ex. C (Johnson Dep.), at 54:9–16.  But as Plaintiff and his brother walked past Officer

Ahktar, the video evidence shows them confronting Officer Ahktar and coming within inches of

Officer Ahktar's face.  *Id.*, Ex. O, at (1:19–20).  A brief physical encounter then ensued between

Officer Ahktar and Plaintiff.  Seconds after Plaintiff came within inches of Officer Ahktar's face,

the video evidence shows Officer Ahktar pushing Plaintiff and his brother away.  *See id.*, Ex. O, at

(1:20–22).  Defendants assert that Plaintiff pushed backed at Officer Ahktar in response, *see* Defs.'

Stmt. ¶ 8, and while the fact of Plaintiff's push remains in dispute, the overhead video evidence

does capture Officer Ahktar suddenly lurching involuntarily backwards, *see* Defs.' Mot., Ex. M, at

(16:24:05–07).  Importantly, the video evidence also depicts this chain of events transpiring

directly in front of Officer Reynolds.  *See id.*  Indeed, immediately after Officer Ahktar lurched

backwards, Officer Reynolds stepped forward to confront Plaintiff.  *See id.*, Ex. M, at (16:24:06–

08).  The video then shows Plaintiff move quickly towards Officer Reynolds in response.  *See id.*

And in his deposition, Plaintiff explained that, at this point, he got within an inch of Officer

Reynolds' face and said "fuck you."  *See id.*, Ex. C (Johnson Dep.), at 99:1–11; Pl.'s Objection ¶

10.  Officer Reynolds then grabbed Plaintiff and placed him under arrest.  *See* Pl.'s Opp'n at 9.

## 2.   Probable Cause Analysis

The Court will now consider whether the undisputed facts in the record, specifically excluding consideration of those facts in dispute, provided probable cause for Plaintiff's arrest. A defendant can defeat a constitutional false arrest claim under § 1983 if "the arresting officer had probable cause to believe that the arrestee committed a crime." *Reiver v. District of Columbia*, 925 F. Supp. 2d 1, 7 (D.D.C. 2013) (quoting *Scott*, 101 F.3d at 754). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (quotation omitted). "Probable cause is not a high bar." *Id.* "To determine whether an officer had probable cause for an arrest, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.*

Here, Defendants argue that the facts in this case supported probable cause to arrest Plaintiff under the District of Columbia's Assault on a Police Officer ("APO") statute. *See* D.C. Code § 22–405(b) (2015); Defs.' Mot. at 7–10. Under the APO statute in effect at the time of Plaintiff's arrest, anyone who, "without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor[.]" D.C. Code § 22–405(b) (2015); *see also Kyle v. Bedlion*, 177 F. Supp. 3d 380, 396 (D.D.C. 2016). District of Columbia courts addressing this APO statute have explained that a violation occurs where the defendant's actions "cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty." *Bedlion*, 177 F. Supp. 3d at 396 (quoting *Howard v. United States*, 966 A.2d 854, 856 (D.C. 2009)). "The 'key is the active and oppositional nature of the conduct for the purpose of thwarting a police

officer in his or her duties.'" *Id.*

When evaluating whether Plaintiff's conduct here was sufficiently "active and oppositional," the reasoning in *Cheek v. United States*, 103 A.3d 1019 (D.C. 2014), is instructive. In *Cheek*, two MPD officers were investigating a fight that occurred between two girls on a Washington, D.C. street, amidst a "large, disorderly crowd of 20–30 people." *Id.* at 1020. After one of the officers arrested a girl involved in the fight, Edwin Cheek "approached the officer, yelling at him, cursing, and staggering, upset over how the officer had treated the woman." *Id.* As he advanced, Mr. Cheek "was within ten feet of the officer and repeatedly disregarded his orders to back up." *Id.* at 1021. Mr. Cheek left momentarily, but then "angrily returned to the already 'contentious' scene and repeated the conduct." *Id.* The officers then arrested Mr. Cheek "for interfering with the investigation," and a trial court subsequently found him "guilty of one count of misdemeanor assault on a police officer ("APO"), in violation of D.C. Code § 22–405(b)." *Id.* at 1020.

On these facts, the District of Columbia Court of Appeals affirmed Mr. Cheek's APO conviction. Notably, the court found that Mr. Cheek's verbal confrontation was not merely "passive," but rather was "active and oppositional as he repeatedly and aggressively came at [the officer] from behind in the midst of an angry mob, despite repeated orders not to do so." *Id.* at 1021–22. In its analysis, the court also highlighted that the arresting officer "felt 'threatened' and 'distracted,' and was concerned for his safety, that of his partner, and the girl he had in handcuffs." *Id.* at 1021. Accordingly, the *Cheek* Court reasoned that "the officer's ability to ensure [their] safety and conduct an investigation of the fight was severely impeded by [Mr. Cheek's] repeated conduct." *Id.*

The facts of the present case are substantially similar to those in *Cheek*. As in *Cheek*, the

14

events precipitating Plaintiff's arrest involved a violent altercation occurring in a public place with a crowd of at least twenty bystanders present. And similar to the officers in *Cheek*, Officer Reynolds was surrounded by a "hostile" environment in the moments leading up to Plaintiff's arrest, *see* Defs.' Mot., Ex. B (Reynolds Dep.), at 85:4–16, a fact supported by the objective video evidence in the record showing an audibly confrontational crowd challenging the arresting officers, *see id.*, Ex. O, at (0:00:21–50). Moreover, like Mr. Cheek, Plaintiff affirmatively positioned himself only feet away from police officers who were actively engaged in an arrest scene—here, of two different individuals: Mr. Horton Smith-Shearer and Mr. Favors. *See id.*, Ex. O, at (01:05–11); *id.*, Ex. M, at (16:23:50–24:04). Then, as the video evidence shows, Plaintiff confronted Officer Ahktar, coming within inches of his face, despite Officer Ahktar's instructions to back up. In response, Officer Ahktar tried to push Plaintiff away from him. And even if Plaintiff did not push Officer Ahktar in return, *see* Pl.'s Objection ¶ 8, the video evidence shows Officer Ahktar lurching suddenly away from Plaintiff after this physical encounter. Moreover, this encounter between Plaintiff and Officer Akhtar occurred directly in front of Officer Reynolds. Immediately thereafter, Officer Reynolds went forward to address Plaintiff, but Plaintiff then moved back towards Officer Reynolds and said "fuck you" within inches of his face. *See* Defs.' Mot., Ex. C (Johnson Dep.), at 99:1–11. Uttering "fuck you" to a police officer within inches of his face, in the midst of an ongoing arrest scene and in defiance of repeated requests to back up, evinces aggressive and oppositional conduct.

Given that similar conduct supported a *conviction* under the APO statute in *Cheek*, the Court concludes that Plaintiff's confrontational conduct here supplied probable cause for his arrest under that same statute. *See Wesby*, 138 S. Ct. at 586 (noting that probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity")

15

(quotation omitted).  Moreover, the Court reaches this conclusion even setting aside the disputed allegations regarding whether Plaintiff pushed either Officer Ahktar or Officer Reynolds immediately before his arrest.  *See* Pl.'s Objections ¶¶ 8, 11; Fed. R. Civ. P. 56(c)(1).  Importantly, the absence of physical touch does not negate the finding of probable cause here, otherwise established by Plaintiff's sufficiently confrontational behavior within an active arrest scene.  *See Smith v. United States*, 121 F. Supp. 3d 112, 122 (D.D.C. 2015), *aff'd*, 843 F.3d 509 (D.C. Cir. 2016) ("Smith need not actually have touched Rogers to be convicted of assault on a police officer . . .").  Consequently, the Court concludes that Officer Reynolds possessed probable cause to arrest Plaintiff under the misdemeanor APO statute.  The presence of this probable cause alone is fatal to Plaintiff's § 1983 claim for false arrest.  *See Reiver*, 925 F. Supp. 2d at 7.[4]  Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Count VII of the Amended Complaint.

## B.  Retaliatory Arrest (Count IX)

In Count IX of the Amended Complaint, Plaintiff asserts a related claim for retaliatory arrest in violation of his First Amendment rights.  *See* Am. Compl. ¶¶ 93–96.  The Supreme Court has recently explained, however, that "[t]he plaintiff pressing a retaliatory arrest claim must plead

---

[4] Even if probable cause was lacking, however, Officer Reynolds would still be entitled to qualified immunity for Plaintiff's § 1983 claim of false arrest.  "Qualified immunity shields officers from suit for false arrest when, 'in light of clearly established law and the information the [arresting] officers possessed,' a reasonable officer could have believed the arrest was lawful.'"  *Hall v. District Columbia*, 867 F.3d 138, 155 (D.C. Cir. 2017) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).  Here, the relevant case law "demonstrate[s] the fuzzy parameters of D.C.'s APO crime," *Bedlion*, 177 F. Supp. at 397, a development attributable to the fact that each APO case involves "balancing [that] must be conducted, on a case-by-case basis, in an intensely factual analysis," *In re C.L.D.*, 739 A.2d 353, 357 (D.C. 1999).  Such ambiguity hardly evinces a clearly established standard that would have placed Officer Reynolds on notice of the absence of probable cause for Plaintiff's arrest, and, as noted above, the case presenting the closest factual analogue to the present action weighs *in favor* of the existence of such probable cause.  *See Cheek*, 103 A.3d at 1020.  Accordingly, the Court does not find that "'controlling authority' or [a] 'robust consensus of cases of persuasive authority' . . . deprive[s] [Officer Reynolds] here of the cloak of qualified immunity."  *Bedlion*, 177 F. Supp. at 398, n.8 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)).

and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019).  As explained in detail in Section III.A.2, however, Plaintiff has not shown the absence of probable cause for his arrest here.  This alone defeats his claim and renders summary judgment as to Count IX appropriate.  *See, e.g.*, *Hinkle v. Beckham Cty. Bd. of Cty. Commissioners*, 962 F.3d 1204, 1227 (10th Cir. 2020) ("We have already concluded that Deputy Estep had probable cause to arrest Hinkle. So, under *Nieves*, Hinkle's retaliatory-arrest claim must fail."); *Lund v. City of Rockford*, 956 F.3d 938, 944 (7th Cir. 2020) ("[T]he *Nieves* Court answered the only question posed in this case: Does probable cause to make an arrest defeat a claim that the arrest was in retaliation for speech protected by the First Amendment? The answer, the Supreme Court held . . . is 'yes.'").

Moreover, the probable cause supporting Plaintiff's arrest does not fall within the "narrow qualification" carved out by the Supreme Court for "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."  *Nieves*, 139 S. Ct. at 1727 (providing the example of "jaywalking").  To the contrary, the record shows that Plaintiff's arrest derived from his confrontational behavior directed towards police officers within an active arrest scene.  *See* disc. *supra* at Section III.A.2.  And Plaintiff's opposition cites no record evidence indicating that Plaintiff's arrest occurred in response to his First Amendment speech, rather than to the ongoing public safety concern Defendants encountered.  *See* Pl.'s Opp'n at 43; *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  For these reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Count IX of the Amended Complaint.

## C. Fabrication Of Evidence (Count VIII)

Next, Plaintiff argues that Officer Ahktar violated his constitutional rights by including fabricated evidence in Plaintiff's arrest report and providing that falsified report to federal

prosecutors.  *See* Am. Compl. ¶¶ 87–92; Pl.'s Opp'n at 35–42.[5]  In relevant part, this arrest report

stated:

> "[A] black male, later identified as defendant Johnson pushed Officer Reynolds and struck
> Officer Reynolds under his right eye with a closed fist.  A struggle ensued as officer
> Reynolds attempted to place defendant Johnson in handcuffs.  Defendant Johnson
> continued to pull away from the officer."

Pl.'s Opp'n, Ex 14 at 3.  In his deposition, Officer Ahktar testified that he submitted this arrest

report to the United States Attorney's Office on the day of Plaintiff's arrest.  *See id.*, Ex. 2 (Ahktar

Dep.), at 124–125.  Officer Ahktar further stated that the designated federal prosecutor made his

charging decision against Plaintiff based "on the circumstances, including the arrest report" itself.

*See id.*, Ex. 2 (Ahktar Dep.), at 130:4–10.  On March 9, 2016, federal prosecutors subsequently

charged Plaintiff with a misdemeanor offense for assaulting a police officer in *United States v.*

*Johnson*, 2016-CMD-003474.  *See* Pl.'s Opp'n at 40–41; *see also id.*, Ex. 15 (Johnson Docket

Report).  This prosecution lasted over four months and included an arraignment hearing and a

"stay-away" order.  *See id.*, Ex. 15 (Johnson Docket Report).  Plaintiff contends that this

prosecution was motivated by Officer Ahktar's arrest report, which contained falsified information

in violation of his constitutional rights.

　　　The Court must first properly frame this constitutional claim.  While Plaintiff invokes both

the Fifth *and* Sixth Amendments in his Amended Complaint, his opposition brief presents this

---

[5] Count VIII of the Amended Complaint asserts this fabrication-of-evidence claim specifically against
Officer Ahktar.  *See* Am. Compl. ¶¶ 87–92.  In his opposition brief, however, Plaintiff ostensibly expands
this fabrication claim to reach Officers Willis and Reynolds as well.  *See* Pl.'s Opp'n at 38.  "It is a well-
established principle of law in this Circuit that a plaintiff may not amend h[is] complaint by making new
allegations in h[is] opposition brief."  *Budik v. Ashley*, 36 F. Supp. 3d 132, 144 (D.D.C. 2014), *aff'd sub*
*nom. Budik v. United States*, No. 14-5102, 2014 WL 6725743 (D.C. Cir. Nov. 12, 2014) (citation omitted);
*see also Wright v. United States Dep't of Justice*, 121 F. Supp. 3d 171, 183 n.7 (D.D.C. 2015) ("[I]t is
inappropriate for a Court to consider new claims raised for the first time in a brief in opposition to a motion
for summary judgment.").  Accordingly, the Court limits the scope of Count VIII exclusively to Officer
Ahktar.

fabrication-of-evidence claim as a matter arising under the Fifth Amendment. *See* Pl.'s Opp'n at 40. Such an approach comports with prior courts in this jurisdiction, which have evaluated fabrication-of-evidence claims as matters of substantive due process. *See Hall v. District of Columbia*, 308 F. Supp. 3d 269, 274 (D.D.C. 2018); *Molina-Aviles v. District of Columbia*, 824 F. Supp. 2d 4, 9 (D.D.C. 2011); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (noting the applicability of the Fifth Amendment Due Process Clause to District of Columbia residents). And although the Second Circuit has hinted at a unique "fair trial" claim arising under the Sixth Amendment, *see Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276, n.6 (2d Cir. 2016), a plurality of the circuits consider fabrication-of-evidence claims as matters of substantive due process as well. *See Black v. Montgomery Cty.*, 835 F.3d 358, 369 (3d Cir. 2016); *Winslow v. Smith*, 696 F.3d 716, 736 (8th Cir. 2012); *McConkie v. Nichols*, 446 F.3d 258, 260 (1st Cir. 2006); *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013). This due process right emanates from the long-acknowledged "principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

In view of the foregoing, the Court will address Plaintiff's Count VIII as a substantive due process claim for fabrication-of-evidence. "In order to establish [such] a substantive due process claim, a plaintiff must show that the state actor was deliberately indifferent to his constitutional rights such that the conduct shocks the conscience." *Molina-Aviles*, 824 F. Supp. 2d at 9 (quoting *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006)). This "shock the conscience" standard sets a high bar and precludes only "government action that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Ali v. Trump*, 959 F.3d 364, 369 (D.C. Cir. 2020) (citations and quotations omitted). Importantly, "[n]egligence alone is insufficient to establish [such] a claim under § 1983." *Molina-Aviles*, 824 F. Supp. 2d at 10

(citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

Within this framework, Plaintiff's fabrication-of-evidence claim cannot survive summary judgment.  At most, the record presents some factual disputes regarding the circumstances of Plaintiff's arrest.  For example, Plaintiff testified that he neither "pushed Officer Reynolds" before his arrest, nor "struck Officer Reynolds under his right eye with a closed fist."  *See* Pl.'s Opp'n, Ex. 1 (Johnson Dep.), at 56–57, 60.  Plaintiff has also presented deposition testimony contradicting the idea that he voluntarily "continued to pull away from the officer."  *See id.*, Ex. 1 (Johnson Dep.), at 95:1–5.  But even assuming *arguendo* that Plaintiff's disputed account is accurate, these disputed facts alone do not indicate that Officer Ahktar "deliberately" fabricated his arrest report.

In the context of a fabrication-of-evidence claim, "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014).  And the "misleading impression that [a] report may leave as to the order of events demonstrates at most negligence on the part of [the officer], which is insufficient to sustain a fabrication of evidence claim."  *Riddle v. Riepe*, 866 F.3d 943, 948 (8th Cir. 2017).  Instead, Plaintiff must present "persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the [information] was incorrect, and thus, in effect, offered the evidence in bad faith."  *Halsey*, 750 F.3d at 295.; *see also Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012) ("[A] manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant.").  Accordingly, "it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case."  *Halsey*, 750 F.3d at 295.

The record here simply does not support the level of intentional fabrication necessary to

sustain a substantive due process claim.  In fact, Officer Ahktar's arrest report remains consistent

with the testimony of Officer Reynolds, who stated that Plaintiff did strike him in the head.  *See*

Defs.' Mot., Ex. B (Reynolds Dep.), at 113:15–16.  Officer Ahktar's arrest report is also consistent

with the witness statement from FBI Agent MacDougall, which notes that Plaintiff "swung at

Officer Reynolds with his fists, hitting him in the forehead."  *Id.*, Ex. G (MacDougall Witness

Stmt.).  Moreover, Plaintiff himself admits to saying "fuck you" to Officer Reynolds within inches

of his face just before the take down maneuver.  *See id.*, Ex. C (Johnson Dep.), at 99:1–11.  And,

even in light of the factual disputes surrounding Plaintiff's arrest, the video evidence does clearly

show Plaintiff and Officer Reynolds together on the ground.  Such record evidence weighs against

any finding of deliberate manipulation of the arrest report.  Moreover, the record is devoid of any

"persuasive evidence" showing that Officer Ahktar manufactured false facts "in bad faith," so as

to "shock the conscience."  *Halsey*, 750 F.3d at 295.  Accordingly, the Court **GRANTS**

Defendants' Motion for Summary Judgment as to Count VIII of the Amended Complaint.[6]

## D.  Excessive Force (Count VI)

Plaintiff also asserts an excessive force claim under § 1983 against the individual officer

Defendants.  *See* Am. Compl. ¶¶ 75–81.  As a threshold matter, the Court finds that this excessive

force claim pertains specifically to Officer Reynolds.  Indeed, Officer Reynolds himself carried

out each of the uses of force that Plaintiff claims were excessive.  *See* disc. *infra*, at Section III.D.1–

---

[6] As noted above, the government dismissed Plaintiff's case in July 2016.  Some courts have rejected fabrication-of-evidence claims where the prosecution in question did not result in a conviction, reasoning that no deprivation of liberty ultimately occurred.  *See Saunders-El v. Rohde*, 778 F.3d 556, 561 (7th Cir. 2015).  Judge Richard Leon, writing for this Court, recently dismissed a fabrication-of-evidence claim on summary judgment where the defendant "was not actually *tried* for his alleged crime because the Government . . . dropped the case against him."  *Mehari v. District of Columbia*, No. CV 16-1889 (RJL), 2020 WL 1557265, at *4 (D.D.C. Mar. 31, 2020).  The D.C. Circuit, however, has not yet addressed the question of whether the absence of a conviction negates a fabrication-of-evidence claim and, therefore, the Court does not rest its disposition of Plaintiff's fabrication-of-evidence claim on this issue.

3; Pl.'s Opp'n at 25–35.  Moreover, Plaintiff presents no theory of bystander liability as to any of the other officer Defendants.  *See* Defs.' Mot. at 34–35 (citing *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 72 (D.D.C. 2005)).  It is also undisputed in the record that Officers Coffey, Willis, and Sergeant Martello had no contact with Plaintiff at all.  *See* Defs.' Stmt. ¶¶ 24–26; Pl.'s Objections ¶¶ 24–26.  Consequently, the Court will limit Plaintiff's excessive force claim to Officer Reynolds.

Courts evaluate such claims of excessive force against a familiar standard: whether the officer's use of force was objectively reasonable under the circumstances.  *See Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017).  In assessing the reasonableness of an officer's use of force, the Court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Finally, even where the use of force was not objectively reasonable, qualified immunity will still shield an officer so long as the force did not violate clearly established law.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  In light of this qualified immunity, a motion for summary judgment "is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Okpara v. District of Columbia,* 174 F. Supp. 3d 6, 14 (D.D.C. 2016) (quoting *DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. Cir. 1997)).  Courts may address

22

the two-prongs of this qualified immunity analysis "in any order." *Bedlion*, 177 F. Supp. 3d at 388

(citing *Pearson*, 555 U.S. at 236).

### 1. Officer Reynolds' Take Down Maneuver

Plaintiff first predicates his excessive force claim on the take down maneuver Officer

Reynolds performed on him.  *See* Pl.'s Opp'n at 25–26.  As explained above, this take down

maneuver occurred after Plaintiff had been visibly confrontational with Officers Ahktar and

Reynolds in an active arrest scene, including saying "fuck you" within inches of Officer Reynolds'

face.  Moreover, the entirety of the take down maneuver itself occurred over the course of several

seconds and was clearly captured in the video record.  This video evidence shows Officer Reynolds

pull Plaintiff by his arms, towards his body and then down to the ground.  *See* Defs.' Mot., Ex. M,

at (16:24:10–14).

As Defendants note, a number of courts in this jurisdiction have found similar take down

maneuvers to be reasonable under the Fourth Amendment.  *See, e.g.*, *Scott v. District of Columbia*,

101 F.3d 748, 759–60 (D.C. Cir. 1996) (finding no excessive force where officers "grabbed Scott

and 'slammed' him to the ground" and where "Scott hit the ground on his back, and the officers

proceeded to roll him over, putting their knees on his neck, back, and lower legs.").  Most recently,

the D.C. Circuit considered a comparable take down maneuver in *Hedgpeth v. Rahim*, 893 F.3d

802 (D.C. Cir. 2018).  There, an MPD officer performed a take down maneuver on a non-compliant

pedestrian refusing arrest outside of a bar, by pulling his "left arm" and "also us[ing] his knee to

push the back of [the arrestee's] leg and take him down to the ground."  *Id.* at 805.  This take down

caused the arrestee to fall, so that "his head struck the grid of the paned window of the bar."  *Id.*

As a result, the arrestee "suffered a concussion, headaches, vertigo, and other post-concussive

symptoms."  *Id.*  Nonetheless, the D.C. Circuit held that the officer had not "violated clearly

established law in using a takedown maneuver to subdue [the arrestee]," and affirmed the district

court's decision to grant summary judgment on the basis of qualified immunity.  *Id.* at 810.

In view of this precedent, the Court cannot conclude that Officer Reynolds' take down

maneuver violated clearly established law.  In fact, Plaintiff's take down appears *more reasonable*

than the take down at issue in *Hedgpeth*.  First, Plaintiff's take down was less violent than the take

down at issue in *Hedgpeth*, as Plaintiff's head was not forced into a window or any comparable

object during the maneuver.  Moreover, the take down in *Hedgpeth* did not occur amongst a crowd,

but rather next to a single bystander.  *See Hedgpeth*, 893 F.3d at 805.  To the contrary, Plaintiff's

take down occurred amidst a large and hostile crowd in an active arrest scene, a fact that increased

the need to quickly secure Plaintiff.  *See Graham*, 490 U.S. at 396.  On these facts, and given the

existing precedent in this jurisdiction, a reasonable officer would not have been on notice that

Plaintiff's take down was objectively unreasonable.  *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153

(2018) ("[P]olice officers are entitled to qualified immunity unless existing precedent squarely

governs the specific facts at issue.") (quotation omitted).  As such, Officer Reynolds retains his

qualified immunity for the take down maneuver he performed on Plaintiff.

### 2.  Officer Reynolds' Hand Strikes

Next, Plaintiff grounds his excessive force claim on the hand strikes Officer Reynolds

deployed against him.  *See* Pl.'s Opp'n at 27–34; Am. Compl. ¶ 16.  Here, the record shows that

Officer Reynolds delivered these strikes to Plaintiff's head after bringing Plaintiff to the ground.

*See* Pl.'s Objection ¶ 15; Defs.' Mot., Ex. B (Reynolds Dep.), at 108:8–16; *id.*, Ex. O, at (01:30–

55); *id.*, Ex. M, at (16:24:15–41).  Officer Reynolds was kneeling over Plaintiff's body at the time

of the strikes, *see id.*, Ex. O, at (01:30–55); *id.*, Ex. M, at (16:24:15–41), and in his deposition,

Officer Reynolds explained that he preferred these head strikes because "people are more

compliant when you punch them in the face," *id.*, Ex. B (Reynolds Dep.), at 108:8–16.

Yet despite this record evidence, the factual circumstances surrounding Officer Reynolds' strikes to Plaintiff's head remain in dispute. *See* disc. *supra*, at Section II.B. Defendants contend that the head strikes were necessary to subdue Plaintiff who was "actively resisting arrest." Defs.' Mot. at 17. To support this position, Defendants offer deposition testimony from FBI Agent MacDougall indicating that Plaintiff's legs were "kicking wildly" at the time of his arrest. *See id.*, Ex. D (MacDougall Dep.), at 35:8–16. Additionally, Officer Reynolds testified that Plaintiff punched him *before* Officer Reynolds deployed the head strikes to Plaintiff. *See id.*, Ex. B (Reynolds Dep.), at 107:17. Plaintiff, however, flatly denies that he resisted Officer Reynolds. *See* Pl.'s Objections ¶¶ 14–18. To this end, Plaintiff has offered deposition testimony demonstrating that he never punched Officer Reynolds. *See* Pl.'s Opp'n, Ex. 1 (Johnson Dep.), at 57:2–12. Instead, Plaintiff testified that after Officer Reynolds pulled him to the ground and started to punch his face, Plaintiff's movements were only used to guard himself and cover his head. *See id.*, Ex. 1 (Johnson Dep.), at 56–57; *see also id.* at 97:4–9 (noting that Plaintiff was "trying to guard" himself). Plaintiff further testified that any additional movements were merely reactions to the pain and inability to breathe caused by Officer Reynolds' use of force. *See id.*, Ex. 1 (Johnson Dep.), at 95:1–5.

Moreover, the video evidence in the record does not clarify this factual dispute. *See* Defs.' Mot., Ex. O, at (01:30–55); *id.*, Ex. M, at (16:24:18–41). Defendants assert that this video evidence shows Plaintiff delivering a strike to Officer Reynolds' head, which, in turn, precipitated the blows from Officer Reynolds. *See* Defs.' Reply at 7–9; *id.*, Attachment C. But none of the video evidence clearly captures the initial moments between Officer Reynolds and Plaintiff once they were on the ground. As noted above, Defendants' Exhibit M loses sight of Plaintiff and Officer Reynolds

immediately after the take down occurred, *see* Defs.' Mot., Ex. M, at (16:24:05–12), and Defendants' Exhibit O does not clearly pick up the encounter until after the two are already together on the ground, *see id.*, Ex. O, at (01:30–40).  Furthermore, Plaintiff's hand movements in these videos are far from clear.  Notably, the alleged "punch" or "hit" to Officer Reynolds' face which Defendants say forced Officer Reynolds to deploy his own strikes, *see* Defs.' Stmt. ¶ 14, appears to be a reflexive arm movement that only occurred *after* Officer Reynolds' punched Plaintiff in the face, *see* Defs.' Mot., Ex. O, at (01:30–40); *see also* Defs.' Reply, Attachment C. In short, these videos do not clearly resolve the factual dispute as to whether Plaintiff was subdued or actively resisting Officer Reynolds' arrest.[7]

And importantly, these disputed facts are "material" to Plaintiff's excessive force claim. FED. R. CIV. P. 56(a).  Indeed, the reasonableness of Officer Reynolds' strikes will turn on the very question of whether Plaintiff was subdued before the strikes or, conversely, whether he was actively resisting Officer Reynolds.  *See, e.g.*, *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 64–65 (D.D.C. 2018) ("According to Jackson, the officers beat him for no reason as he lay subdued on the ground, trying to shield himself from the blows. Obviously, a jury could find that this constituted excessive force.") (citing *Harris v. United States Dep't of Veterans Affairs*, 776 F.3d 907, 913–15 (D.C. Cir. 2015)); *Williams v. District of Columbia*, 268 F. Supp. 3d 178, 191 (D.D.C. 2017) ("Thus, if a jury were to credit Williams' account that he was prone, subdued, and not resisting, it would be unreasonable to repeatedly hit his head and smash it into the ground in order to secure him in handcuffs."); *Ingram v. Shipman–Meyer*, 241 F. Supp. 3d 124, 141 (D.D.C. 2017)

---

[7] "Whether an individual has been subdued does not turn on whether they are handcuffed, but on whether they are under the officer's physical control such that they no longer threaten the physical safety of others or pose a risk of flight." *Williams v. District of Columbia*, 268 F. Supp. 3d 178, 191 n.5 (D.D.C. 2017); *see also* Defs.' Mot., Ex. B (Reynolds Dep.), at 113:14–15 ("And then once I got him on the ground, I was just kind of laying on top of him.").

("The use of force on a suspect who has already been subdued is plainly excessive.").

Similarly, the question of qualified immunity for Officer Reynolds' strikes also depends on whether Plaintiff was subdued or resisting arrest.   If Plaintiff was subdued, the use of head strikes against him could have violated clearly established law.   *See Williams*, 268 F. Supp. 3d at 193; *see also Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.").   Alternatively, the use of hand strikes may be appropriate—and not in violation of clearly established law—where the arrestee is not subdued, but rather resisting.   In *Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993), for example, an officer received qualified immunity despite punching an arrestee in the jaw, while the arrestee "rushed down the stairs" towards the officer.   *Id.* at 1300, 1304.   But, as outlined above, factual disputes remain in this case regarding whether Plaintiff was subdued or resisting arrest at the time of Officer Reynolds' strikes.   In light of these factual discrepancies, Defendants have not carried their burden to "show that there is no genuine dispute as to any material fact" regarding Plaintiff's claim that Officer Reynolds' hand strikes constituted excessive force.   FED. R. CIV. P. 56(a).

### 3.   Officer Reynolds' Shove Of Plaintiff Against The Police Car

Finally, Plaintiff bases his excessive force claim on Officer Reynolds' act of "smashing" Plaintiff against the hood of a police car, after Plaintiff had been placed in hand restraints.   Pl.'s Opp'n at 34–35.   The entirety of this episode is captured on video, included within the record.   *See* Defs.' Mot., Ex. N, at (03:25–50).   As shown therein, Officer Reynolds escorted Plaintiff on foot towards a police vehicle parked on 7th Street.   At this time, Plaintiff's hands were restrained behind his back, and Officer Reynolds was holding Plaintiff's left arm.   *See id.*, Ex. B (Reynolds Dep.), at 127:12–14.   When Plaintiff and Officer Reynolds reached the police car, Officer Reynolds

positioned Plaintiff with his back and restrained hands against the vehicle.  *See id.*, Ex. N, at
(03:33–36).  At this moment, the video shows that Officer Reynolds had released Plaintiff's arm
and Plaintiff was facing Officer Reynolds.  *See id*.  Plaintiff then lifted his torso away from the
police vehicle and moved his body slightly towards Officer Reynolds, with his hands still
restrained behind his back.  *See id.*, Ex. N, at (03:36–37).  The video then shows that Officer
Reynolds grabbed Plaintiff's sweatshirt, quickly turned Plaintiff around so that he faced the other
direction, and pushed Plaintiff's upper body against the police car for approximately seven
seconds.  *See id.*, Ex. N, at (03:39–46).  As Officer Reynolds testified, he "physically grabbed
[Plaintiff's] upper body" then "turned him around and pushed him up against the car and held
him."  *Id.*, Ex. B (Reynolds Dep.), at 128:19–22.

    Yet, despite this record evidence, the cause of the altercation between Officer Reynolds
and Plaintiff remains in dispute.  Officer Reynolds testified that just before he shoved Plaintiff
against the police car, Plaintiff "spit in [his] face."  *See* Defs.' Mot., Ex. B (Reynolds Dep.), at
128:1.  Plaintiff, however, denies this act.  *See* Pl.'s Objections ¶ 22.  Instead, Plaintiff testified
that he did not spit in Officer Reynolds' face, but rather said "fuck you" and "fuck all y'all."  Pl.'s
Opp'n, Ex. 1 (Johnson Dep.), at 74:2–17.  This competing deposition testimony leaves the question
of whether Plaintiff spit in Officer Reynolds' face in dispute.  And even after a close review of the
video evidence provided in Defendants' Exhibit N, the Court cannot reach any resolution of this
disputed fact on the basis of the ambiguous footage.  *See* Defs.' Mot., Ex. N, at (03:39–46).

    Moreover, this disputed fact is "material" to the reasonableness of Officer Reynolds' shove
of Plaintiff and to the corresponding issue of qualified immunity.  Courts within this jurisdiction
(and without) have found that force applied against a restrained arrestee is both unreasonable and
in violation of clearly established law.  *See Williams*, 268 F. Supp. 3d at 193 (collecting cases); *see*

*also McCowan v. Morales*, 945 F.3d 1276, 1287 (10th Cir. 2019) (finding it clearly established "that applying gratuitous force to a restrained and compliant misdemeanant suspect violated the Fourth Amendment"). Conversely, where an arrestee's oppositional conduct persists, forcing the arrestee against a police vehicle to subdue them may be a reasonable use of force. *See Armbruster v. Frost*, 962 F. Supp. 2d 105, 113–115 (D.D.C. 2013) (holding that no excessive force was used where the arrestee was pushed onto the hood of her car after "actively resisting the officer's efforts to restrain her"). Here, the Court cannot make a finding either way. The nature of Officer Reynolds' shove of Plaintiff is directly impacted by the question of whether or not Plaintiff assaulted Officer Reynolds by spitting in his face. And, as explained above, the parties dispute this material fact and the video evidence provides no further resolution on the issue. Consequently, Defendants have not carried their burden at the summary judgment stage to "show that there is no genuine dispute as to any material fact" regarding Plaintiff's claim that Officer Reynolds' shove constituted excessive force. FED. R. CIV. P. 56(a).

For the reasons set forth above, the Court **DENIES** Defendant's Motion for Summary Judgment as to Count VI of the Amended Complaint, specifically as to Officer Reynolds' use of hand strikes against Plaintiff's head and Officer Reynolds' shove of Plaintiff against the police car.

### PLAINTIFF'S COMMON LAW CLAIMS

The Court will next consider Plaintiff's common law claims for false arrest, malicious prosecution, and assault. The Court may exercise supplemental jurisdiction over these common law claims under 28 U.S.C. § 1367(a).

### A. Common Law False Arrest (Counts III and IV)

Plaintiff's common law claims for false arrest mirror his § 1983 claim for false arrest, as "the elements of a constitutional claim for false arrest are substantially identical to the elements of

a common-law false arrest claim." *Reiver v. District of Columbia*, 925 F. Supp. 2d 1, 7 (D.D.C. 2013) (quoting *Scott v. District of Columbia*, 101 F.3d 748, 753–54 (D.C. Cir. 1996)).  Of note, the existence of probable cause is equally fatal to both claims.  Specifically, an officer "will have a complete defense to a false arrest claim" at common law, "if a police officer has so-called constitutional probable cause to arrest, determined by reference to the objective standard used to determine probable cause in a criminal proceeding." *Scales v. District of Columbia*, 973 A.2d 722, 729 (D.C. 2009) (quotation omitted).

Because of these overlapping contours, the interests of judicial economy weigh in favor of this Court's exercise of supplemental jurisdiction over Plaintiff's common law false arrest claims. *See Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423–24 (D.C. Cir. 2005).  As described above in Section III.A.2, undisputed evidence in the record demonstrates that Officer Reynolds possessed probable cause for Plaintiff's March 8, 2016 arrest under the District of Columbia's APO statute.  *See* D.C. Code § 22–405(b).  This finding of probable cause applies with equal force to Plaintiff's common law false arrest claims and, accordingly, those claims also fail to survive Defendants' Motion for Summary Judgment.  *See Amobi v. District of Columbia Dep't of Corr.*, 755 F.3d 980, 989 (D.C. Cir. 2014) ("Constitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action."); *Smith v. United States*, 121 F. Supp. 3d 112, 122 (D.D.C. 2015) (dismissing both common law and constitutional false arrest claims where probable cause existed).  The Court, therefore, **GRANTS** Defendants' Motion for Summary Judgment as to Counts III and IV of the Amended Complaint.[8]

---

[8] Plaintiff's false arrest claim in Count IV of the Amended Complaint rests on a *respondeat superior* theory of liability against the District of Columbia.  *See* Am. Compl. ¶¶ 68–71.  But here, "[s]ince the defendant officers are not liable, neither can their employer, the District of Columbia, be held liable for . . . false arrest under the doctrine of *respondeat superior*." *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 98 (D.D.C. 2015) (citing *Scales*, 973 A.2d at 728).

### B.  Malicious Prosecution (Count V)

The Court will also exercise its discretion and address Plaintiff's common law claim for malicious prosecution, asserted here against the District of Columbia.  *See* 28 U.S.C. § 1367(a); Am. Compl. ¶¶ 72–74.  "Under District of Columbia law, a plaintiff alleging malicious prosecution must prove (1) a criminal proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; and (4) malice, defined as 'a primary purpose in instituting the proceeding other than that of bringing an offender to justice.'"  *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 254–55 (D.D.C. 2018) (quoting *DeWitt v. District of Columbia*, 43 A.3d 291, 296 (D.C. 2012)).  Because "[l]ack of probable cause is an essential element of an action for malicious prosecution," "a showing of probable cause is thus a valid defense which warrants a directed verdict for the defendant." *Ammerman v. Newman*, 384 A.2d 637, 639 (D.C. 1978).

In this case, the United States Attorney's Office did charge Plaintiff with a misdemeanor violation for assault on a police officer.  *See* Pl.'s Opp'n, Ex. 15 (Johnson Docket Report). Nonetheless, as set forth in Section III.A.2, probable cause existed for this charge, and this probable cause defeats Plaintiff's malicious prosecution claim at common law.  *See Ammerman*, 384 A.2d at 639; *see also Smith v. United States*, 843 F.3d 509, 513 (D.C. Cir. 2016) (affirming district court's holding that the existence of probable cause for defendant's arrest foreclosed his malicious prosecution claim).  Moreover, Plaintiff has offered no plausible allegations of malicious action on the part of his prosecutor, much less credible record evidence to call into question the exercise of prosecutorial discretion, present here in the face of established probable cause. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Count V of the Amended Complaint.

### C.  Common Law Assault (Counts I and II)

Finally, the Court will also exercise its supplemental jurisdiction over Plaintiff's common law claims for assault.  *See* Am. Compl. ¶¶ 56–63.  Here, the Amended Complaint specifically bases its assault claims upon the allegation that "one or more of the defendant officers savagely beat Mr. Johnson."  *Id.* ¶ 57.  Upon review of the record, however, the Court agrees with Defendants that this claim pertains specifically to Officer Reynolds, and also derivatively to the District of Columbia under the doctrine of *respondeat superior*.  *See* Defs.' Mot. at 26; *id.*, Ex. O, at (01:30–55) (showing Officer Reynolds' physical interaction with Plaintiff); *id.*, Ex. M, at (16:24:18–41) (same); *id.*, Ex. N, at (03:39–46) (same).  As noted above in Section III.D, Plaintiff presents three specific instances of force by Officer Reynolds for the Court to consider: (1) the take down maneuver, (2) the head strikes, and (3) the shove against the police car.

As an initial matter, each use of force constitutes both a common law assault and battery, which arise, respectively, where there is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim" (an assault), or where there is "an intentional act that causes a harmful or offensive bodily contact" (a battery).  *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993).  The question here, instead, is whether Officer Reynolds had the legal right to use such force.  *See* Defs.' Mot. at 26–27 (focusing on the issue of qualified privilege).  At common law, "[a] police officer has a qualified privilege to use reasonable force to [a]ffect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary."  *Etheredge*, 635 A.2d at 916 (quotation omitted).  "[T]he test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the

same situation." *Scales*, 973 A.2d at 730. "The objective piece of the qualified privilege analysis is similar to the excessive force standard applied in the Section 1983 context." *Williams*, 268 F. Supp. 3d at 194 (quotation omitted).

Within this framework, the Court finds that Officer Reynolds is entitled to a qualified privilege for his tactical take down maneuver. This use of force, described more fully above, was captured on video included within the record before the Court. *See* Defs.' Mot., Ex. M, at (16:24:10–14). And prior courts have affirmatively found similar uses of force to be objectively reasonable. *See, e.g.*, *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 87 (D.D.C. 2015) (holding that an officer "reasonably used a tactical takedown maneuver to force the plaintiff to ground"). The Court is persuaded by such holdings, and upon review of the record evidence in this case pertaining to Plaintiff's take down, the Court concludes that it is not "so apparent that no reasonable officer could have believed in the lawfulness" of this force. *Fulwood v. Porter*, 639 A.2d 594, 598 (D.C. 1994) (quotation omitted). Accordingly, Officer Reynolds is entitled to a qualified privilege for the tactical take down maneuver he performed on Plaintiff.

Nonetheless, the Court cannot extend a qualified privilege to Officer Reynolds for his repeated strikes to Plaintiff's head or for his shove of Plaintiff's upper body against the police car. As explained above in the Court's § 1983 discussion, genuine disputes of material fact remain as to (1) whether Officer Reynolds' struck Plaintiff in the head while Plaintiff was subdued or while Plaintiff was actively resisting arrest, and (2) whether Plaintiff spit in Officer Reynolds' face before he was shoved against the police car. *See* disc. *supra*, at Section III.D.2–3. Accordingly, resolution of Plaintiff's common law assault claim as to these incidents is not proper at the summary judgment stage. Furthermore, this denial of qualified privilege to Officer Reynolds also preserves Plaintiff's common law assault claim in Count II against the District of Columbia. *See* Am. Compl. ¶¶ 60–

63.  Defendants have presented no argument as to why such a *respondeat superior* theory of liability against the District should fall short where a common law assault claim against Officer Reynolds survives summary judgment.  *See* Defs.' Mot. at 26–27.  "Lacking any argument from Defendants in favor of summary judgment, the Court need not address the appropriateness of summary judgment for applying *respondeat superior* to [the] remaining common law tort claim."  *Xingru Lin v. District of Columbia*, No. CV 16-645 (CKK), 2020 WL 3542253, at *22 (D.D.C. June 30, 2020).[9]  For these reasons, the Court **DENIES** Defendants' Motion for Summary Judgment as to Counts I and II of the Amended Complaint.

## IV.   CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' [41] Motion for Summary Judgment.  Specifically, the Court **GRANTS** Defendants' Motion as to Plaintiff's claims for False Arrest (Counts III, IV, and VII), Malicious Prosecution (Count V), Fabrication of Evidence (Count VIII), and Retaliatory Arrest (Count IX).  The Court, however, **DENIES** Defendants' Motion as to Plaintiff's claims for Assault (Counts I and II) and Excessive Force (Count VI).  Plaintiff's claims in Counts I, II, and VI may proceed only as they apply to Officer Reynolds' use of hand strikes against Plaintiff and Officer Reynolds' shove of Plaintiff against the police car.

An appropriate Order accompanies this Memorandum Opinion.

Dated:  September 30, 2020

/s/
_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[9] The parties do not raise, and therefore the Court does not address, the propriety of maintaining a stand-alone claim on the basis of *respondeat superior*.  *Cf. Williams*, 268 F. Supp. 3d 185, n.1 ("[T]he doctrine of respondeat superior is not a free standing tort and thus cannot be its own distinct claim.").